**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JASON BICKFORD

     Plaintiff,

v.

CITY AND COUNTY OF BROOMFIELD, COLORADO; and
OFFICER ANTHONY TEETERS, individually,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Jason Bickford, through his counsel, Michael P. Fairhurst and Darold W. Killmer of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

## I.    INTRODUCTION

1.     This is a civil rights action based on Defendants' brutal and manifestly unjustified beating of the Plaintiff, Jason Bickford, in violation of his clearly established rights secured by the Fourteenth Amendment to the United States Constitution.

2.     On October 2, 2019, Defendant Master Police Officer (MPO) Anthony Teeters of the Broomfield Police Department arbitrarily stormed into Mr. Bickford's single-person cell in the Broomfield Detention Center like a charging bull. He immediately forcibly struck Mr. Bickford's collarbone area without issuing commands of any kind.

3.      Defendant Teeters then unjustifiably flung Mr. Bickford around and forcefully slammed him head and face-first into a concrete wall, before tackling him to the concrete floor on his stomach.

4.      Once Mr. Bickford was on the ground, Defendant Teeters intermittently choked Mr. Bickford and crushed his face into the concrete floor as Mr. Bickford begged him for mercy when he could breathe.

5.      At no relevant time was Defendant Teeters justified in using any physical force on Mr. Bickford, much less the crushing physical force to which he sadistically subjected Mr. Bickford. At no relevant time did Mr. Bickford harm or threaten to harm anyone, or otherwise resist law enforcement.

6.      Mr. Bickford was never even charged with, much less convicted of, any criminal offense related to his conduct in the Broomfield Detention Center.

7.      Defendant Teeters, in subjecting Mr. Bickford to grossly excessive force, was at all times acting consistent with and pursuant to the City and County of Broomfield's policies and practices. With deliberate indifference to its obligation to comply with the mandates of the Constitution, Defendant Broomfield tolerates, condones, encourages, and ratifies the excessive use of force among its law enforcement. This includes Defendant Teeters' gratuitous beating of Mr. Bickford.

8.      As a result of Defendants' excessive and unconstitutional use of force against Mr. Bickford, he has suffered serious and lasting injuries, including but not limited to significant and ongoing trauma to his head and face, and severe emotional distress.

## II.      JURISDICTION AND VENUE

9.      Jurisdiction over Plaintiff's claim is conferred upon this Court pursuant to 28

U.S.C. § 1331 and § 1343(a)(3), and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiff's claim for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events described herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

### III.     PARTIES

11.     At all times relevant, Plaintiff Jason Bickford was a resident of the State of Colorado and a citizen of the United States of America.

12.     At all times relevant, Defendant Anthony Teeters was a citizen of the United States and a resident of the State of Colorado, and was acting under color of state law in his capacity as a master police officer employed by the Broomfield Police Department ("BPD"). Defendant Teeters is sued in his individual capacity.

13.     Defendant City and County of Broomfield, hereinafter "Broomfield," is a Colorado municipal corporation and is the legal entity responsible for itself, Broomfield Detention Center, and the BPD, including all of those entities' customs, policies, and practices.

### IV.     STATEMENT OF FACTS

**The BPD arrests Mr. Bickford at his home for a minor alleged offense without incident.**

14.     On the morning of October 2, 2019, Mr. Bickford and his fiancée at the time had a disagreement while they were inside his home.

15.     Mr. Bickford's fiancée pushed him into a wall during their argument, and she then stormed out of the house.

16.     Around lunchtime, Mr. Bickford's fiancée returned home from work with a few work friends.

17.     Shortly thereafter, Mr. Bickford left his home to go for a walk.

18.     Mr. Bickford's fiancée's friends convinced her to call the police, which she did.

19.     Broomfield police initially contacted Mr. Bickford as he was walking around the neighborhood. The involved officers included but were not necessarily limited to BPD Officers Randy Pihlak and Dustin Cornett.

20.     Once back at Mr. Bickford's apartment, the two officers arrested Mr. Bickford's fiancée for assaulting him during their argument earlier that day, in the morning.

21.     After the argument with his fiancée, Mr. Bickford had damaged a bookshelf (including an iPad and some books that fell off the shelf) while he was alone in his home. He was aggravated by a malfunctioning computer at the time.

22.     Because of the broken objects, Mr. Bickford was accused of criminal mischief, even though it was in fact unrelated to the disagreement he and his fiancée had.

23.     As a result, the two officers on scene took Mr. Bickford into BPD's custody at around 7:18 pm outside of his home. The arrest transpired without incident.

24.     The two officers then transported Mr. Bickford to the Broomfield Detention Center, also without incident.

**Mr. Bickford becomes increasingly frustrated with his arrest after he arrives at the jail, but (still) does not threaten to harm anyone or attempt to harm anyone.**

25.     Mr. Bickford was upset about having been arrested by the time he arrived at the jail. Mr. Bickford believed that he was first and foremost the *victim* of a physical assault and had done nothing wrong that would have justified his arrest and detention in jail.

4

26.     Because Mr. Bickford seemed dismayed, jail staff skipped the typical booking process, including taking booking photos, during Mr. Bickford's admission to jail and instead placed him in a small single-person holding cell around 7:53 pm.

27.     Because Mr. Bickford was unhappy about being kept in the cramped, lonely, and extremely uncomfortable holding cell, he decided to feign a suicide attempt in hopes of being transferred to what he believed to be the less unpleasant medical unit. Mr. Bickford's seemingly indefinite confinement in the tiny, cold holding cell added to insult to injury from his perspective, as he believed that he had no business being in the jail in the first place.

28.     Mr. Bickford tied one of his shoelaces around his neck in front of one of the surveillance cameras in his cell.

29.     Around 8:13 pm, Officer Logan Ross and Defendant Teeters responded to Mr. Bickford's cell, opened his cell door, and began to speak with him.

30.     Mr. Bickford continued to communicate that he was upset about his arrest and resulting detention in jail.

31.     Officers Heidi Scott, John Heaton, Ericka Mazzocco, and Jonathan Skigen arrived shortly thereafter.

32.     Officer Scott took over speaking with Mr. Bickford at his cell entrance.

33.     Meanwhile, Officer Mazzocco obtained a suicide smock for Mr. Bickford. The primary issue at this time was that Mr. Bickford may present a threat to himself (based on his feigned suicide attempt) but not others.

34.     While Mr. Bickford left no doubt that he was displeased with his situation at the time, he did not threaten to harm any of the officers, nor did he attempt to harm any of them. Mr. Bickford also did not ever say anything indicating that he presented a threat to himself. It was

evident that he had feigned a suicide attempt in view of a surveillance camera merely to cause officers to come to his cell door.

**Defendant Teeters needlessly, deliberately, and dangerously escalates Mr. Bickford's situation into a serious excessive-use-of-force event.**

35.     In the moments that followed, Defendant Teeters needlessly, deliberately, and dangerously escalated Mr. Bickford's situation into a serious use-of-force incident, all the while acting consistent with and pursuant to BPD's customs, policies, and practices.

36.     While talking with Officer Scott, Mr. Bickford kicked off his left shoe towards the wall near the door where the officers were standing, still frustrated by his truly exasperating situation. The shoe harmlessly struck the wall at least a foot away from Officer Scott and benignly fell to the ground. Around the same time, Mr. Bickford also benignly knocked off his other shoe next to him on the ground in an effort to avoid any confusion that he might attempt to kick that shoe towards the door.

37.     No more than five seconds later, Defendant Teeters shoved Officer Scott aside and aggressively charged into Mr. Bickford's cell, while Scott gleefully exclaimed "get him!" Before this moment, no officer had been near Mr. Bickford in his cell or been threatened by Mr. Bickford.

38.     Teeters' checked off Scott's body camera with his elbow as he barnstormed into Mr. Bickford's cell.

39.     Without issuing any commands of any kind, Defendant Teeters—who was at least double the weight of Mr. Bickford—forcefully and without justification struck Mr. Bickford with a powerful karate chop to his left collarbone area.

40.     Next, Defendant Teeters unjustifiably flung Mr. Bickford around and slammed him head and face-first into a concrete wall. This body slam delivered an absolutely excruciating and crushing blow to Mr. Bickford's head and face.

41.     Teeters then threw Mr. Bickford to the concrete ground on his stomach.

42.     There existed no objectively reasonable basis for Defendant Teeters to go hands-on with Mr. Bickford at all.

43.     Mr. Bickford was not physically resisting in any way, was not failing to comply with any command at the time and was not threatening anyone. Defendant Teeters intentionally and/or recklessly chose to escalate the situation needlessly and intentionally—a situation that could have been effectively addressed merely by the use of words (which Teeters failed to even try to use in a meaningful way)—into one involving severe and excessive physical force.

44.     Officer Ross and Scott stormed in Mr. Bickford's cell soon after Defendant Teeters did.

45.     Officer Scott manifested downright stunning indifference to Teeters' unnecessary escalation of the situation, casually blowing a bubble with her chewing gum around the time she saw Defendant Teeters indefensibly beat Mr. Bickford.

46.     After Defendant Teeters slammed Mr. Bickford into the ground, he held down and crushed his upper body while Officer Scott dug her knee into his lower back area and assisted in restraining his legs.

47.     Officer Ross restrained Mr. Bickford's wrists behind his back with handcuffs with Officer Scott's assistance.

48.     Defendant Teeters sadistically intermittently choked Mr. Bickford during this time, while Mr. Bickford was fully under the control of law enforcement on the ground.

49.     During this, Mr. Bickford audibly begged—when he could breathe—for Teeters to stop crushing his face into the ground but Defendant Teeters kept crushing his face into the ground anyway for no reason other than to maliciously inflict pain and other injuries on Mr. Bickford.

50.     Mr. Bickford also notably calmly and politely (given the terrible abuse he was enduring) said things like: "Why did you do that," "I'm not resisting you," "Stop hitting my face against the floor please," and "Please stop pushing my face."

51.     Officer Scott asked Mr. Bickford if he was going to comply as Teeters was crushing his face and intermittently strangling him, to which Mr. Bickford rightfully queried, "How am I not complying?" Mr. Bickford was not failing to comply with any command at the time.

52.     Indeed, at no relevant time did Mr. Bickford actively or passively resist any officer, attempt to flee from his cell, or try to (or actually) physically harm anyone. Of course, Mr. Bickford obviously was not wielding a weapon either, as he had just been searched by the police and placed in a single-person holding cell. There was no objectively reasonable basis for Defendant Teeters or anyone else to use any degree of physical force against Mr. Bickford at any relevant time.

53.     During Mr. Bickford's beating at Teeters' hands, Officer Skigen brought a restraint chair into the cell.

54.     Defendant Teeters forcibly picked Mr. Bickford up once his hands were cuffed behind his back and arbitrarily threw him into the restraint chair. Mr. Bickford's horrifying ordeal in the Broomfield Detention Center was far from over.

55.     Defendant Teeters yelled at Mr. Bickford that kicking his shoe at Officer Scott was assault, to which Mr. Bickford correctly stated that he had kicked his shoe at the wall in frustration, *not* at Officer Scott. At all relevant times, Defendant Teeters knew Mr. Bickford had not assaulted Officer Scott.

56.     Tellingly, Mr. Bickford was never charged with, much less convicted of, a single criminal offense related to his interaction with anyone in jail, including but not limited to Teeters and Scott.

57.     After Teeters threw Mr. Bickford in the restraint chair, Teeters and Officers Scott, Heaton, Mazzocco, and Skigen began strapping Mr. Bickford tightly into the chair, restraining his left and right foot, his left and right shoulder, and his waist each in individual straps. All the while, Mr. Bickford's wrists remained handcuffed behind his back.

58.     While being restrained, Mr. Bickford asked why Defendant Teeters had used such an unnecessary amount of force on him. Defendant Teeters angrily responded "you wanna be the victim!" Defendant Teeters plainly was trying to get a rise out of Mr. Bickford in order to escalate the situation yet again.

**Mr. Bickford continues to suffer terribly in the jail from the effects of Defendant Teeters' brutal beating of him.**

59.     After Defendant Teeters brutally beat Mr. Bickford, Teeters and others left him in the restraint chair with his hands cuffed behind his back for over three hours in his single-person holding cell, until around 11:30 pm.

60.     Even Defendant Teeters admitted in his written report that he forced Mr. Bickford to remain in the restraint chair for longer than the "standard" two hours.

61.     While completely restrained in the restraint chair, blood from Mr. Bickford's smashed face accumulated down his face and sweatshirt. Mr. Bickford could not so much as wipe the blood from his face during this time because he was tightly strapped into the chair.

62.     During this time, Mr. Bickford also was weeping from the amount of pain he was experiencing and shivering in his cold single-person cell.

63.     Eventually, Officer Ross noticed how bloody Mr. Bickford's face was getting and attempted to wipe his face off.

64.     This attempted wiping caused Mr. Bickford to recoil in pain, so much so that he had to have Officer Ross hold the wipe near his face so he could his face into it himself.

65.     When officers finally did release Mr. Bickford from the restraint chair, officers placed Mr. Bickford in a suicide smock and initially left him alone in the holding cell without even a place to sit or lie down besides the cold hard concrete floor.

66.     Mr. Bickford then remained in the Broomfield Detention Center for many more nightmarish hours.

67.     During this time, Mr. Bickford's head and face continued to be in excruciating pain. In addition, the right side of his face became increasingly swollen and bruised.

68.     Mr. Bickford also could not keep any food down, repeatedly vomited blood, and believes he suffered a seizure or seizures while alone in his cell.

69.     Once Mr. Bickford was eventually allowed to go to the bathroom to wash his bloodied face, jail staff callously told him something along the lines of: "Make sure you don't get blood everywhere."

70.     When Mr. Bickford was finally released from jail on the morning of October 4, 2019, he still was in excruciating physical pain and psychologically terrorized by the prolonged torment Defendant Teeters had needlessly inflicted upon him.

71.     As a result of Defendant Teeters' intentional conduct described herein, including his manifestly excessive use of force, Mr. Bickford suffered serious and lasting injuries, included but not limited to severe pain and injuries to the side of his face and his nose, damaged teeth, facial disfigurement, and severe pain throughout the right side of his face that persists.

72.     Defendant Teeters' excessive use of force also caused Mr. Bickford to suffer symptoms consistent with a traumatic brain injury, such as vomiting shortly after Teeters slammed his head into the wall, and a severe headache, dizziness, and disorientation at the time. As is often the case with people who have suffered significant traumatic brain injuries, Mr. Bickford continues to experience periodic headaches, visual difficulty, and is unable to think as clearly compared to before the excessive force event.

73.     Additionally, Mr. Bickford has  suffered severe ongoing psychological trauma as a result of Defendant Teeters' brutal and excessive beating—including his head injury caused when Defendant Teeters smashed his head into the concrete cell wall—such as anxiety, depression, and PTSD.

**Defendant Broomfield police department's custom, policy, and practice of excessive force.**

74.     Defendant Broomfield has created, fostered, tolerated, and perpetuated an environment and culture of police brutality and deliberate indifference to the constitutional and statutory rights of citizens and residents. It was foreseeable and virtually inevitable that an incident like the one involving Mr. Bickford would happen under the circumstances.

75.     This culture and environment of brutality, and Broomfield's lack of training, supervision, and discipline of law enforcement officers is evidenced by, among other things, the number of instances of excessive force perpetrated by Broomfield law enforcement.

76.     For years before the events underlying Mr. Bickford's case, up through the present, there has been a well-established culture among Broomfield law enforcement pursuant to which the use of excessive force is acceptable, customary, and does not result in discipline.

77.     On April 1, 2015, Mazen Arakji filed suit against Broomfield and 28 BPD officers, including Officer Scott. Mr. Arakji asserted that BPD officers had engaged in a pattern of violating his constitutional rights both through interactions on the street and interactions in Broomfield Detention Center. When first in Broomfield Detention Center, Mr. Arakji asserted among other claims that he was violently manhandled by officers when being placed in his cell. The next time Mr. Arakji was in Broomfield Detention Center, he claimed that he was unreasonably beaten and tasered by several officers when he simply stated he was being unlawfully detained and attempt to walk past an officer. Mr. Arakji was then unnecessarily restrained in a restraint chair by Officer Scott and was not provided food or a phone call while in custody.

78.     On March 14, 2018, Siraaj Al-Baaj filed suit against BPD Officer Bennet for use of excessive force. Mr. Al-Baaj asserted that he was at a concert at the 1stBank Center when he had a panic attack and was told by private security staff that he could return once his attack subsided, yet when he attempted to return, Officer Bennet prevented him from doing. Officer Bennet grabbed Mr. Al-Baaj's arm, restrained hands behind his back then pushed him through the Center's doors and body-slammed him to the ground. Officer Bennett then flipped Mr. Al-Baaj onto his stomach and multiple officers held him down while Officer Bennett handcuffed

him in an excessively tight manner that left red marks on Mr. Al-Baaj's wrists, as well as scrapes and lacerations on his elbow and shoulder. Due to Officer Bennet's excessive use of force, Mr. Al-Baaj suffered a dislocated left hip, and his hips no longer align causing his back to curve. The case is still ongoing.

79.     As reported by the Denver Post, On December 9, 2019, a family sued BPD Officers Weiman and Norton for using excessive force on their 15-year-old disabled daughter, A.N. The family asserted that A.N. and one of her friends got into a disagreement that left them with minor scraps. A.N. suffered from a rare disorder that caused her muscles, tendons, and other soft tissue to gradually turn into bone; this severely limited her ability to move and even minor, superficial injuries could cause serious harm. Knowing about the disorder, A.N.'s friend called 911 for medical assistance. However, when BPD officers arrived, they arrested A.N. and restrained her with handcuffs. Despite being told about A.N.'s disorder, officers took her to be medically cleared before she was booked into a juvenile detention. During this medical examination, A.N had her arm forcibly pulled upwards causing her great pain due to her limited range of movement, was pinned to an exam table by officers, and was further painfully restrained by having her legs bound together in a leg hobble. Officers then connected the hobble to A.N.'s handcuffs, forcing her into a sitting position that caused her to scream in pain. Due to the BPD's excessive use of force, A.N. suffered from an increased calcification and bone growth around her right shoulder, wrists, and chest, and other injuries. The case is still ongoing.

80.     These cases provide only representative examples of the custom and practice of excessive force by Broomfield law enforcement officers, and the lack of any training, supervision, or discipline on the part of Broomfield to appropriately address these obviously dangerous and unlawful patterns of conduct.

81.     Broomfield's culture of excessive force is further highlighted by Mr. Bickford's situation in the present case. An individual wielding authority as the Master Police Officer for Broomfield Detention Center, Defendant Teeters, was the very person who subjected Mr. Bickford to a patently unreasonable beating that has left him physically and psychologically injured to this day.

82.     Broomfield's culture of condoning excessive force is further shown by the instances of blatant indifference that other jail staff exhibited to the excessive force Mr. Bickford endured. For instance, Officer Scott casually blew a bubble with her chewing gum as she watched Defendant Teeters brutally beat Mr. Bickford. Also, Broomfield jail staff callously refused Mr. Bickford a liquid diet for days even though he plainly could not chew any food because of his obviously serious facial injuries.

83.     The lawsuits and other incidents involving excessive force identified above are illustrative of the culture and customs, policies, and practices that existed during the Defendant Teeters' beating of Mr. Bickford. They were the result of Broomfield's conscious and deliberate policy choices and were the moving force behind the injuries inflicted on Mr. Bickford.

**Broomfield fails to train, supervise, or discipline officers when it comes to using excessive force.**

84.     Broomfield inadequately trains, supervises, and disciplines officers like Defendant Teeters on the proper use of force to use on individuals in pre-trial custody like Mr. Bickford.

85.     As described above, Defendant Teeters needlessly and brutally beat Mr. Bickford while he was in his single-person cell.

86.     Teeters' unreasonable use of force occurred during a situation during which an individual was frustrated about being held in custody and was attempting to verbally

communicate that frustration to officers. Such circumstances foreseeably occur in a jail setting

on a regular basis, and therefore foreseeably must be appropriately addressed by jail staff (like

Defendant Teeters) frequently.

87.    Despite both the frequency of situations like Mr. Bickford's and blatant

unconstitutionality of Defendant Teeters' actions, many officers and jail staff displayed

inadequate responses to the excessive force Mr. Bickford was put through. As mentioned,

Officer Scott casually blew a bubblegum bubble as Defendant Teeters beat Mr. Bickford. Also,

jail staff apparently were more worried about Mr. Bickford possibly dirtying the bathroom with

his blood than the severe swelling, bruising, and bleeding of Mr. Bickford's face, or his bloody

vomiting.

88.    The inadequacy of Broomfield's training and supervision is also evident from the

reports of Officers Ross, Scott, Skigen, Mazzocco, and Heaton concerning Mr. Bickford, which

all directly conflict with either camera footage of the incident and/or Defendant Teeters' own

report.

89.    For example, Officer Ross falsely reported that Defendant Teeters beat Mr.

Bickford in order to "neutralize" him as a threat, yet Mr. Bickford was not being threatening at

all when Teeters beat him. Reinforcing this point, Mr. Bickford was never even charged with any

offense related to his actions while in custody, or even issued a disciplinary charge by the jail.

90.    Officer Heaton falsely reported that Mr. Bickford was uncooperative while being

handcuffed, yet Defendant Teeters' report (correctly) states that Mr. Bickford was not resisting

whatsoever when being restrained.

91.    Addressing other obviously important issues, however, Defendant Teeters lied in

his report. For instance, Defendant Teeters falsely stated in his report that Mr. Bickford had

swelling around face and eye before he beat Mr. Bickford in an effort to cover up the serious injuries he knew he had caused to Mr. Bickford.

92.     Broomfield's inadequate training and supervision are also highlighted by the fact that an individual wielding both large amounts of experience with Broomfield Jail policy as an MPO and supervisory authority as the Active Watch Commander that night, Defendant Teeters, was the very person who subjected Mr. Bickford to excessive force.

93.     The inadequate training and supervision of Defendant Teeters and other jail staff demonstrate deliberate indifference on the part of Broomfield toward persons under the custody and care of Broomfield jail.

94.     Further, it is believed that Broomfield has failed to discipline Defendant Teeters at all for violating Mr. Bickford's constitutional rights. This confirms that, at all relevant times, Defendant Teeters was acting in accordance with Broomfield's policies, customs, and practices.

95.     Further, at all relevant times, Defendant Teeters was acting consistent with and pursuant to Broomfield's training of him. Defendant Teeters was at all relevant times acting in accordance with Broomfield's training of him.

96.     Had Broomfield enacted a different and better training policy concerning proper uses of force by jail staff when dealing with dismayed but non-violent individuals in jail custody (such as appropriate training on verbal and other non-physical de-escalation techniques), Mr. Bickford would not have suffered the unnecessary beating he was subjected to at the hands of Defendant Teeters.

97.     Broomfield has failed to change the way it trains or supervises its jails staff in response to the unjustifiable beating of Mr. Bickford despite being aware of the clear and

significant deficiencies in its training regimen underscored by Mr. Bickford's unlawful and wholly preventable beating.

98.     Defendant Broomfield was aware of the aforementioned deficiencies in its training, supervision, and discipline well before Teeters' beating of Mr. Bickford as well because of, e.g., the obvious deficiencies in its training and other excessive force cases described above.

99.     Moreover, Defendant Teeters is no stranger to the use of excessive force against inmates. On June 27, 2018, Defendant Teeters twice Tased Inmate Evan Pfosi—the second full five-second Taser cycle delivered after Mr. Pfosi was obviously disabled and nonthreatening, and only able to stand with the assistance of other BPD officers.

100.     As he awaited transfer to Colorado State Hospital for mental health care, Mr. Pfosi began to block the windows of his cell with blankets and other objects from his cell. When a BPD sergeant attempted to remove the objects from Mr. Pfosi's cell window, Mr. Pfosi approached to discuss the situation. Approximately six BPD personnel, including Defendant Teeters, stood outside the cell.

101.     As Mr. Pfosi moved toward the sergeant, Defendant Teeters immediately and unnecessarily tased him for five seconds. Mr. Pfosi face went blank and he fell back against the cell wall next to the door, twitching and shaking. The sergeant and a second BPD officer stepped forward and supported Mr. Pfosi so that he would not fall to the ground; he was obviously disabled by the Taser. Mr. Pfosi was no longer able to act of his own volition, and was literally in the arms of BPD officers, yet as the officers moved Mr. Pfosi toward the cell door without incident, Defendant Teeters discharged a second taser cartridge and tased Mr. Pfosi for an additional five seconds.

102.     Approximately two seconds passed before the first Tasing and the second; Defendant Teeters offered no warning or orders of any kind to Mr. Pfosi prior to either tasing. Finally, *after* the second tasing, Defendant Teeters began to give Mr. Pfosi orders to go to the ground, and the officers supporting him dumped him to the jail floor. As other officers moved Mr. Pfosi—who offered no resistance whatsoever—into a restraint chair, Defendant Teeters threatened to tase him for a third time.

103.     The BPD investigator assigned to review Defendant Teeters' conduct in the incident with Mr. Pfosi identified numerous violations of BPD policy and training, including but not limited to an unnecessary second taser discharge, a failure to give warning or orders prior to using the taser, a failure to attempt to deescalate the situation (or even speak to Mr. Pfosi) or ensure that others had done so prior to using force, and discharging a taser with fellow officers as the backdrop. Nonetheless, Defendant Broomfield failed to discipline Mr. Teeters in any way for his obviously abusive and unconstitutional actions.

104.     As a direct and proximate result of Broomfield's inadequate training, supervision, and discipline, along with its other customs, policies, and practices described herein, Mr. Bickford's constitutional rights were violated, which caused him substantial damages.

## STATEMENT OF CLAIMS FOR RELIEF

### (42 U.S.C. § 1983 Fourteenth Amendment Violation – Excessive Force)
### (Against all Defendants)

105.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

106.     The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Plaintiff of his securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from

excessive force as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983, in that the Defendant Teeters had no reasonable basis to believe that Plaintiff was a threat to anyone or had engaged in any misconduct before subjecting him to excessive force.

107.    Defendant Teeters' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

108.    Defendant Teeters' actions, as described above, were motivated by an intent to harm Plaintiff.

109.    Defendant Teeters' actions, as described herein, were undertaken intentionally, willfully, and wantonly.

110.    Defendant Teeters' conduct violated clearly established rights belonging to Plaintiff of which reasonable law enforcement officers knew or should have known.

111.    The acts of Defendant Teeters were engaged in pursuant to the custom, policy, and practice of Defendant Broomfield, which encourages, condones, tolerates, and ratifies the use of excessive force by law in its law enforcement officers.

112.    One such custom, policy, and practice of Defendant Broomfield is its failure to properly hire, train, supervise, and/or discipline members of its jail staff regarding the proper use of physical force with pre-trial detainees.

113.    This inadequate hiring, training, and/or supervision results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant Broomfield.

114.     Such failure to properly hire, train and supervise was a moving force behind and proximate cause of Defendant Teeters' use of excessive force against Plaintiff, and constitutes an unconstitutional policy, procedure, custom, and/or practice.

115.     Plaintiff has been and continues to be damaged by Defendant Teeters' use of excessive force against him.

116.     The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of, and the moving force behind, Plaintiff's damages.

117.     As a direct result of Defendants' unlawful action as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants, and grant:

(a)     Appropriate declaratory and other injunctive and/or equitable relief;

(b)     Compensatory and consequential damages, including damages for physical injuries and pain, emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)     All economic losses on all claims allowed by law;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and the costs associated with this action, including those associated with expert witness fees, on all claims allowed by law;

(f)     Pre and post-judgment interest at the lawful rate; and

(g)   Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 30th day of September 2021

KILLMER, LANE & NEWMAN, LLP

s/ Michael Fairhurst
Michael P. Fairhurst
Darold W. Killmer
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
mfairhurst@kln-law.com
dkillmer@kln-law.com

*Attorneys for Plaintiff*